# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | | |
|---|---|---|
| **JOHN D. GREGORY** | * | **CIVIL ACTION NO.  13-2978**<br>**Section P** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **RICKY JONES, ET AL.** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Before the court are cross-motions for summary judgment filed by plaintiff John D. Gregory [doc. # 25] and defendants Ricky Jones, Fred Schoonover, and John Smith [doc. #s 21 & 32].  Pursuant to Standing Order 3.311 and 28 U.S.C. § 636(b)(1)(B), the District Court referred the motions to the undersigned magistrate judge for report and recommendation.   For reasons stated below, it is recommended that plaintiff's motion for summary judgment [doc. # 25] be DENIED, and that defendants' motions for summary judgment [doc. #s 21 & 32] be GRANTED.

## Procedural History

John D. Gregory was an inmate in the custody of Louisiana's Department of Public Safety and Corrections ("DOC") who, during the relevant period, was housed at the Tensas Parish Detention Center ("TPDC"), Waterproof, Louisiana.[1]  On October 30, 2013, Gregory filed the instant pro se civil rights complaint pursuant to 42 U.S.C. § 1983 against Tensas Parish

---

[1]  Gregory was released from DOC custody on August 1, 2014.  *See* doc. # 40.

Sheriff Ricky Jones, TPDC Warden John Smith, and Deputy Warden Fred Schoonover.[2]
Gregory alleges two claims in support of his complaint:  1) unsafe and unlivable conditions of
confinement; and 2) inadequate medical attention.[3]   Specifically, he alleges that from at least
August 21 through September 2013, he was placed in a lock down cell(s) that had no ventilation,
mold growing on the walls, a spider infestation, rusty beds, a lack of cleaning supplies, and only
two showers per week.  As a result of these conditions, Gregory developed a staph infection, on
or about August 25, 2013, that he contends was not properly treated, and which ultimately
culminated in his hospitalization in the early hours of September 3, 2014.  Upon his return to the
facility, Gregory states that the warden and assistant warden threatened him if he continued to
complain.  He seeks a cash award of $50,000 to compensate him for his pain and suffering,
mental anguish, and distress.[4]

On December 10, 2013, the court completed its initial screening pursuant to 28 U.S.C.§§
1915 and 1915A, and ordered service on Jones, Smith, and Schoonover, via U.S. Marshal.  (Dec.
10, 2013, Mem. Order [doc. # 8]).  On March 7, 2014, all three defendants answered the
complaint.  (Answer [doc. # 19]).[5]

---

[2] Although the docket sheet lists Helen Leonard as a defendant, plaintiff did not name her
as a defendant.  Thus, she was not served with the complaint, and has not appeared in this matter.

[3] Plaintiff also included a third claim for cruel and unusual punishment.  However, the
facts alleged in support of this claim merely expand upon plaintiff's claims for inadequate
medical care and unsanitary living conditions.  Therefore, consideration of the third claim is
subsumed within the court's resolution of the other claims.

[4] Gregory also requested a transfer because he feared for his health and safety.  This
request for relief is moot, however, as he is no longer in custody.

[5] Defendants filed an amended answer on April 1, 2014.  (Amend. Answer [doc. # 24]).

On March 31, 2014, defendants filed their initial motion for summary judgment seeking dismissal of plaintiff's complaint for failure to exhaust available administrative remedies.  On April 8, 2014, Gregory filed his own motion for summary judgment on the issue of administrative exhaustion, which also served as his opposition to defendants' motion for summary judgment.  Defendants filed a reply memorandum on April 22, 2014.

On April 25, 2014, defendants filed their second motion for summary judgment seeking dismissal of plaintiffs' claims on the merits.  On May 16, 2014, plaintiff filed a response to defendants' reply memorandum, in which he stated that he could better prove his case after August 1, 2014, once he was released from custody.  On May 22, 2014, defendants filed a reply memorandum.  Despite having been released from custody more than two months ago, plaintiff has not sought to supplement his responses.  Accordingly, the matter is ripe.

## Summary Judgment Principles

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a).  A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2511 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party.  *Id*.

 "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

3

any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id.*

In evaluating the evidence tendered by the parties, the court must accept the evidence of the non-movant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. "The court *need* consider only the cited materials, but it *may* consider other materials in the record." Fed.R.Civ.P. 56(c)(3) (emphasis added). While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). There can be no genuine dispute as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-23. This is true "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

When a movant bears the burden of proof on an issue, it must establish "beyond peradventure[6] all of the essential elements of the claim . . . to warrant judgment in [its] favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). In other words, the movant must

---

[6] I.e., beyond doubt.

4

affirmatively establish its right to prevail as a matter of law.  *Universal Sav. Ass'n v. McConnell*, 1993 WL 560271 (5th Cir. Dec. 29, 1993) (unpubl.).

**<u>Analysis</u>**

**I.      Exhaustion of Administrative Remedies**

a)      <u>Law</u>

Pursuant to 42 U.S.C. § 1997e, as amended by the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a). Exhaustion is mandatory, and is required even where the relief sought cannot be granted by the administrative process.  *Woodford v. Ngo*, 548 U.S. 81, 85, 126 S.Ct. 2378, 2382-83 (2006) (citations omitted).  All "available" remedies must be exhausted, whether speedy and effective, or not.  *Porter v. Nussle*,  534 U.S. 516, 524, 122 S.Ct. 983, 988 (2002).  "Proper exhaustion requires that the prisoner not only pursue all available avenues of relief but also comply with all administrative deadlines and procedural rules."  *Johnson v. Kukua*, 342 Fed. Appx. 933, 934 (5th Cir. 2009) (citing *Woodford, supra*).  An untimely or otherwise procedurally defective administrative grievance does not satisfy the exhaustion requirement.  *Id*.

"[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter, supra* (citation omitted).  An inmate is required to "exhaust his remedies, irrespective of the form of relief sought, injunctive or monetary." *Richbourg v. Horton*, 2008 WL 5068680 (5th Cir. Dec. 2, 2008) (unpubl.) (citation omitted).  A

5

claim for deliberate indifference to an inmate's serious medical needs also is subject to exhaustion. *Harris v. Hegmann*, 198 F.3d 153, 158 (5th Cir. 1999). In addition, exhaustion applies to claims brought against defendants in their official and/or individual capacities. *See e.g., Williams v. Henagan*, 595 F.3d 610, 618 (5th Cir. 2010); *Hines v. Texas*, 76 Fed. Appx. 564 (5th Cir. 2003).

The Fifth Circuit has consistently held that an inmate's ignorance of a prison's grievance procedures does not excuse his noncompliance. *Aguirre v. Dyer*, 233 Fed. Appx. 365 (5th Cir. 2007) (citation omitted); *Simkins v. Bridges*, 350 Fed. Appx. 952, 953-954 (5th Cir. 2009) (citation omitted); *Plaisance v. Cain*, 374 Fed. Appx. 560, 561 (5th Cir. 2010) (citation omitted). Nonetheless, inmates should have "avenues for discovering the procedural rules governing their grievances." *Dillon v. Rogers*, 596 F.3d 260 (5th Cir. 2010) (citations omitted). When an inmate has no means of verifying the administrative grievance process, then misleading information by prison officials may make remedies unavailable. *Id.* "If impediments to filing grievances render remedies unavailable at one facility, remedies may become available again once a prisoner has been transferred, unless there are other problems at the new facility." *Dillon*, 596 F.3d at 267-268 (citing *Bryant v. Rich*, 530 F.3d 1368, 1379 (11th Cir.2008)). Stated another way, the grievance filing period is tolled only so long as the inmate is actually impeded from invoking and exhausting the process.

A prisoner is required to exhaust all steps of a grievance process even if the prison fails to respond to his grievances at an earlier step in the process. *Hicks v. Lingle*, 370 F. Appx. 497, 499 (5th Cir. 2010); *Ates v. St. Tammany Parish*, Civ. Action No. 13-5732, 2014 WL 1457777 (E.D. La. Apr. 15, 2014). Moreover, to the extent that language on the form or policy regarding

subsequent step review is phrased in discretionary rather than mandatory terms, the prisoner still must exhaust all "available" steps.  *Ates, supra* (and cases cited therein).  In short, the courts "will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise." *Booth v. Churner*, 532 U.S. 731, 741, 121 S. Ct. 1819, 1825, n. 6 (2001).

Exhaustion is an affirmative defense; thus, the burden is on defendant to establish that plaintiff failed to exhaust available administrative remedies.  *Dillon*, 596 F.3d at 266.  If the court considers evidence beyond the pleadings to resolve the exhaustion issue, then the nonmoving party is entitled to the protections of Rule 56.  *Id.*

b)       The TPDC had an Available Administrative Remedy Procedure

 Under Louisiana law, the Department of Public Safety and Corrections and each sheriff is authorized to adopt an administrative remedy procedure at each of their institutions.  La. R.S. § 15:1171.  The administrative remedy procedure is intended to resolve complaints and grievances that arise while the offender is in the custody of, or under the supervision of the department or sheriff.  *Id.*  The procedure encompasses complaints and grievances for monetary, injunctive, declaratory, or other relief stemming *inter alia* from conditions of confinement, personal injuries, and medical malpractice.  *Id.*  These administrative procedures, when promulgated, provide the offender's exclusive remedy – to the extent that federal law permits.  *Id.*

The uncontroverted evidence establishes that the TPDC had a two step Administrative Remedy Procedure ("ARP") in effect during the relevant period.  (Affidavit of John Smith and TPDC Offender Rules and Regulations Handbook; Def. MSJ, Exh. A).  The ARP is set forth in the TPDC's Offender Rules and Regulations Handbook (the "Handbook"), which Gregory

7

received on June 11, 2013, after his latest arrival at the TPDC.  *See* Affidavit of Warden John

Smith, Def. MSJ, Exh. and TPDC Orientation on Intake Form and Offender Property Sheet [doc.

# 19, pgs. 5-6].[7]

Under the ARP, a detainee is required to complete an "Inmate Grievance Form," seal the

grievance in an envelope marked "grievance," address it to the warden, and place the grievance

in the kitchen mail box for delivery to the warden.  (Handbook, pgs. 15-16; Def. MSJ, Exh. A).

The written grievance must be filed within 30 calendar days "from the date of the incident or the

complaint occurred, unless it was not feasible to file within such period."  *Id.*  The "First

Respondent" will have "up to 15 days from receipt of the grievance to fully investigate, act on

and provide a written response to the inmate."  *Id.*

If an inmate is dissatisfied with the decision of the "First Step Respondent," then he "may

file for Step II by indicating so on the Inmate Grievance Response Form and forwarding it to the

Warden within 5 days."  *Id.*  Thereafter, the Warden shall ensure that "the inmate receives a

response in writing within 25 days of receipt of the request for Step II review."  *Id.*

c)      <u>Gregory Did Not Complete Both Steps of the Grievance Process</u>

In support of their motion for summary judgment, defendants adduced evidence that the

sole claim for administrative review filed by Gregory at the TPDC stemmed from his complaint

that he was not receiving medical treatment for a serious "STD."  (Warden Smith Affidavit, Def.

MSJ, Exh. A; Emergency ARP, Def. MSJ, Exh. B).  However, there is a notation on the bottom

of the grievance, that is dated October 9, **2012**, indicating that Gregory was to be sent to E.A.

Conway Hospital for evaluation. (Emergency ARP, Def. MSJ, Exh. B).  In other words, the

---

[7]  It appears that Gregory had prior stints at the TPDC.

8

grievance did not pertain to the circumstances as issue in the present case.  Moreover, there is no indication that Gregory further appealed that grievance.

In his motion for summary judgment/opposition to defendants' motion, plaintiff adduced a copy of a grievance dated September 7, 2013, that he claims to have transmitted to the DOC, the Office of the Governor, and Warden John Smith.  (Pl. MSJ, Exh. A).[8]  However, plaintiff's representations are neither sworn, nor made under penalty of perjury.[9]  It is manifest that unsworn statements do not suffice to create disputed issues of material fact which justify a trial.  *Oglesby v. Terminal Transp. Co., Inc.*, 543 F.2d 1111, 1112 (5th Cir. 1976); *see also Teixeira v. Gregg Cnty. Jail*, 74 F. App'x 388, 389 (5th Cir. 2003) (inmate's unsubstantiated assertion that he filed an administrative appeal is insufficient to sustain his evidentiary burden under Rule 56) (citation omitted).  Moreover, contrary to plaintiff's present representation, he indicated on the handwritten grievance that he sent copies to DOC Headquarters, the Office of the Governor, and *his personal lawyer* – i.e., not to Warden Smith.

In sum, defendants adduced evidence that, for purposes of the instant complaint, plaintiff failed to exhaust both steps of the available grievance process at the TPDC.  Although plaintiff produced a grievance that he says he submitted to the DOC (and possibly to the TPDC warden),

---

[8]  The grievance spans the period from August 25-September 5, 2013, and complains of inadequate medical attention, cruel and unusual punishment, no ventilation and unlivable/unsafe conditions.  *Id*.

[9]  Federal law permits unsworn declarations to substitute for an affiant's oath if the statements contained therein are made "under penalty of perjury" and verified as "true and correct."  *See Ion v. Chevron USA, Inc.*, 731 F.3d 379, 382 n2 (5th Cir. 2013) (citing 28 U.S.C. § 1746).

he did not present any evidence that he exhausted *both* steps of the TPDC grievance procedure.[10]

Under these circumstances, the court is compelled to find that there is no genuine dispute as to any material fact and that movants are entitled to judgment as a matter of law dismissing plaintiff's claims for failure to exhaust administrative remedies.  Fed.R.Civ.P. 56(a) & (e)(3); *Teixeira, supra*.

d)      Remedy for Failure to Exhaust

The plain language of the PLRA precludes any further action on plaintiff's claims until he has fully exhausted the administrative remedy procedure.  *See Wendell v. Asher*, 162 F.3d 887, 890-91 (5th Cir.1998) (§ 1997e(a) "plainly requires that administrative remedies be exhausted before the filing of a § 1983 suit, rather than while the action is pending . . . [t]o hold otherwise would encourage premature filing by potential litigants, thus undermining Congress' purpose in passing the PLRA, which was to provide the federal courts some relief from frivolous prisoner litigation.").

However, the court may reach the merits of the complaint notwithstanding plaintiff's failure to exhaust when, as here,

> the only issue presented to the court is a clearly focused § 1983 constitutional claim, where the state [sought] judgment on the merits (in addition to invoking PLRA exhaustion), where the parties engaged in discovery, and where the purposes of PLRA exhaustion would be confounded by requiring administrative exhaustion at this stage . . .

*Thorson v. Epps*, 701 F.3d 444, 446 (5th Cir. 2012).

Furthermore, dismissal, at this stage, for failure to exhaust is effectively a dismissal with

---

[10]  Plaintiff contends that because he was in DOC custody, he only needed to comply with DOC grievance procedures.  However, plaintiff is challenging conditions at the TPDC and the actions of TPDC personnel.  Accordingly, he is required to exhaust the TPDC grievance process.

prejudice because of Gregory's failure to timely invoke the grievance process.  Accordingly, the undersigned will proceed to the merits of plaintiff's complaint.

## II.    Inadequate Medical Care

a)    <u>Law</u>

As a convicted inmate, plaintiff's claim for inadequate medical care is analyzed under the Eighth Amendment's prohibition against cruel and unusual punishment.  To establish liability, an inmate must adduce facts which "clearly evince" a serious medical need and the prison official's deliberate indifference to it.  *Hernandez v. Velasquez*, 522 F.3d 556, 561 (5th Cir. 2008) (citation omitted); *see also Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976).

Deliberate indifference in the context of an episodic failure to provide reasonable medical care to a prisoner means that:  (1) the official was aware of facts from which an inference of substantial risk of serious harm could be drawn; (2) the official actually drew that inference; and (3) the official's response indicates that the official subjectively intended that harm occur. *Thompson v. Upshur County, Tx.,* 245 F.3d 447, 458-59 (5th Cir. 2001).   "[T]he failure to alleviate a significant risk that [the official] should have perceived, but did not is insufficient to show deliberate indifference."  *Domino v. Texas Department of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001).  Moreover, "deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm."  *Thompson*, 245 F.3d at 459.  "Deliberate indifference encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind."  *McCormick v. Stalder*, 105 F.3d 1059, 1061 (5th Cir. 1997); *see also Stewart v. Murphy*, 174 F.3d 530, 534 (5th Cir. 1999).  "[A] delay in medical care violates the Eighth Amendment only if it is due to deliberate indifference and

11

results in substantial harm." *Gregory v. McKennon*, 2011 WL 2473714 (5th Cir. June 22, 2011) (unpubl.) (citation and internal quotation marks omitted).

b)   <u>Discussion</u>

In his unverified complaint, plaintiff alleges that on August 25, 2013, he was exposed to a dangerous staph infection, but despite completing several medical request forms, he was not examined until August 29, 2013.  *See* Compl.  Medical staff told Gregory that he would be okay, and returned him to his cell.  On August 31, 2013, Gregory fainted and was unable to breathe or walk as a result of his deteriorating condition.  Medical staff again returned him to his cell.  On September 1, 2013, Gregory fainted for a second time.  He complained of serious chest pains, dizziness, and shortness of breath.  His leg had swollen to twice its normal size below his right knee, and he was unable to stand or walk because of the infection.  Again, medical staff returned him to his cell.  On September 2, 2013, Gregory fainted for a third time, and was brought to medical in a wheelchair.  Nurse Leonard advised him, however, that he was faking his injuries, and purportedly insulted Gregory's mother and told him that he was going to die just like her. Gregory was returned to his cell.  Later that evening, at about 10:30 p.m., Gregory fainted for a fourth time, and was transported in a wheelchair to the medical department by a guard.  The night shift nurse called Nurse Leonard who told her to return Gregory to his cell.  However, the night shift nurse called Dr. Sarah Lee who ordered Gregory transported to the hospital, where he was admitted.  Gregory underwent surgery to install a penrose drain.  He also received antibiotics and pain medication intravenously.

Gregory further complains that because of the unclean shower area, he developed a serious fungal infection on his foot.  He alleges that it was not properly diagnosed until he went

to the hospital, whereupon Dr. Schoofield prescribed anti-fungal cream.  Upon his return to the

TPDC, however, Nurse Leonard advised Gregory that he had to purchase the anti-fungal cream at

the prison commissary with his own funds.  The commissary, however, did not stock the cream.

     Plaintiff reiterated his allegations regarding his leg infection and improper treatment for

his foot fungus in his response to defendants' motion for leave to file a reply memorandum.

[doc. # 35].  However, plaintiff's response is neither sworn, nor made under penalty of perjury.

In fact, it is not signed at all.  In short, plaintiff's statements in his unverified complaint and in

his unsworn response(s) do not constitute competent summary judgment evidence to be

considered by the court in response to defendants' motion.  *See Moore v. True Temper Sports,*

*Inc.*, 523 F. App'x 280 (5th Cir. 2013) (citation omitted).  Indeed, in response to a properly

supported motion for summary judgment, the opposing party cannot meet his burden by relying

on the allegations in his pleadings or on unsubstantiated assertions.  *Harris v. Smith*, 482 F.

App'x 929, 930 (5th Cir. 2012) (citation omitted).

     In support of their motion for summary judgment, defendants submitted an affidavit from

Nurse Helen Leonard that recounted the chronology of plaintiff's treatment for his infected leg.[11]

Defendants incorporated this evidence into their Statement of Uncontested Material Facts, which

plaintiff did not controvert through his own statement of material facts supported by competent

summary judgment evidence.  Accordingly, defendants' statement of material facts is deemed

admitted.  *See* Fed.R.Civ.P. 56(e)(2) and LR 56.2 (material facts in the moving party's statement

are deemed admitted unless controverted by non-movant's statement).  The court's recitation of

the medical chronology tracks defendants' Statement of Uncontested Material Facts, as

---

[11]  Plaintiff's TPDC medical file is filed in the record herein as Document Nos. 19 & 28.

13

supplemented by the court's independent review of plaintiff's medical file:[12]

I)       On June 14, plaintiff was seen in medical by Dr. Lee.  She prescribed Benadryl and cough syrup for five days.  [doc. # 19-3, pg. 10].

ii)     On June 28, plaintiff returned to Dr. Lee.  He complained of pain behind his ear and swelling.  He also complained of specific STD-like symptoms and a patch of dermatitis on his foot.  He stated that creams had not worked.  However, his STD test in Marksville had been negative.  Dr. Lee diagnosed eczema and genital papules.  She prescribed hydrocortisone and referred plaintiff to LSU-Dermatology.  [doc. # 19-3, pg. 9].

iii)    On July 8, plaintiff was seen at E.A. Conway Hospital for complaints of clavical pain of two month duration that had worsened one week earlier.  Lawrence Hill, M.D., diagnosed shoulder/clavicle joint pain, and prescribed Lodine.  [doc. # 19-3, pgs. 5, 11].

iv)    On July 16, the nurse practitioner examined plaintiff for a sore on his foot that would not heal.  Upon examination, she observed a raw, open blister on the right inner, instep.  The nurse practitioner diagnosed an open blister to the right foot, and applied Silvadene cream.  [doc. # 19-3, pgs. 3, 26].

v)     On August 6, plaintiff was seen at E.A. Conway for complaints of reflux-related laryngitis and enlarged lymph nodes.  Watts Rankin Webb, M.D. prescribed Zantac. [doc. # 19-2, pg. 63].

vi)    On August 9, plaintiff was seen by Dr. Lee with complaints of an abscess under his upper lip; knots behind his ear; sore throat; and a sore on his right foot.  She diagnosed pharyngitis, with upper frenulum abscess, and right foot eczema/psoriasis.  She prescribed a "Z pack" and warm saltwater gargle.  [doc. # 19-2, pg. 60].

vii)   On August 16, plaintiff returned to Dr. Lee.  She prescribed hydrocortisone for his right foot, and referred him to LSU-Dermatology.  She also prescribed Claritin. [doc. # 19-2, pg. 5].

1.      On August 28, plaintiff completed a medical request form in which he complained of a spider bite to his right leg and swelling of his leg.

2.      On August 29, plaintiff was seen in medical.  Upon examination, it was noted that he had a 3-4 cm red area to his right outer leg, with no pin-point area. The wound was cleansed with hydrogen-peroxide and triple antibiotic ointment was applied. The wound was covered with clean dry dressing.  Plaintiff was instructed to return in six hours if the condition worsened, or in twenty-four hours if there was no improvement.  He also was

---

[12]  Unless otherwise noted, all events occurred in 2013.

instructed on keeping the wound clean, dry, and covered with a bandage.

3.      On August 30, plaintiff was seen in medical by Dr. Lee for his spider bite and cellulitis. On examination, he had swelling to his right lower extremity.  Plaintiff requested a medical transfer out of the facility because he did not know what was wrong and claimed that his "foot [was] leaking."  Plaintiff was directed to the warden regarding his transfer request. His prescription for Lodine was discontinued, and Dr. Lee prescribed Bactrim, an antibiotic, though September 8.  He was instructed on bed rest and how to elevate his foot.

4.      During medication pass on September 1, plaintiff stated that he wanted to go to the hospital because his right leg was not improving.  He had right leg pain, increased temperature, and swelling and redness on his right outer leg near the knee.

5.      Later on September 1, plaintiff was seen by the nurse practitioner.  He stated that his right lower leg was "killing him," as he had cut it the day before with a razorblade.  He claimed that he could not walk or put pressure on his right leg.  He was not feeling well and wanted to go to the hospital.  Upon examination, he had a small open site, which appeared to be a spider bite.  Also, his right leg was warm to the touch.  His Bactrim prescription was increased for the remaining ten days, and he was given an additional antibiotic Rocephin,.  He was instructed to return to see Dr. Lee for a recheck on Friday, and to continue to elevate and stay off of his leg.  He was encouraged to relax and to give the medication time to work.  He was prescribed Tylenol, and given an extra fan after complaining of stuffiness in the hall cell.

6.      After remaining in the observation area for some time on September 1, plaintiff stated that he was ready to return to his cell.

7.      When his cell door was opened on September 2, plaintiff crawled out into the hallway. He requested to see a sergeant or lieutenant, and stated that he could not take it anymore. He stated that he was unable to walk and felt that the staff was going to let him die.  He reported that his temperature had been 106 degrees the other night.  He was brought to medical, and given Tylenol for his temperature.  He was argumentative the entire time, and stated that no one was doing anything for him.  Upon examination his right leg had continued redness and swelling.  Also, his skin was shiny in appearance and warm to the touch.  He was placed under observation.

8.      On September 2, an incident report was completed indicating that plaintiff had passed out.  He had been to medical numerous times the past week and had seen Dr. Lee on Friday.  He also had seen the nurse practitioner that day and was given medication. With another inmate's encouragement, he pretended to pass out.  He was brought to medical by security, and placed in the "cage" in front of a fan.  He spoke with Lieutenant Morgan, and began arguing with him.  While in a wheelchair in medical, he was advised to return

15

to his cell and that he was being written up for malingering. He became very angry and called the nurse a b**** and stated that he did not care. He told the nurse that she was a stupid old b**** and that she would die when she got home. He said that he would knock the hell out of her, and told her that she was going to get it. The lieutenant was informed. After he was written up, plaintiff tore the write-up into pieces and threw it at the nurse. He again told the nurse that he would knock the hell out of her. Nurse Leonard informed plaintiff that he was just using his spider bite as a way out of the facility, and that she did not intend to send him to the hospital or anywhere else because he had already been treated.[13]

9.  Later that evening, at 12:15 a.m., on September 3, plaintiff was holding his leg and crying because of the pain. The duty nurse contacted Dr. Lee, who authorized his transportation to E. A. Conway Hospital Surgical Clinic for evaluation. At 1:30 a.m., plaintiff departed for the hospital. Upon arrival, he was diagnosed with cellulitis and an abscess on his right lower leg. He underwent an incision and drainage of the abscess, with insertion of a penrose drain.

10.  On September 4, plaintiff was discharged from E. A. Conway Hospital Surgical Clinic. At that time, he still complained of significant pain, but conceded that it was improving. The redness and swelling was beginning to decrease. He was prescribed Bactrim, anti-fungal cream, and Norco. He was instructed to return in one week.

11.  Plaintiff was seen at TPDC medical on September 4. His orders from E. A. Conway Hospital Surgical Clinic were reviewed, and it was noted that his wound culture was positive for staph. He was instructed to keep his wound clean and dry, to wash it in the shower with mild soap and water, to dry it well, and to change the dressing twice per day. He also was instructed to elevate his right leg with a blanket or pillows. Upon examination, the area was red and swollen. The area was cleaned and dressing was reapplied. Plaintiff's prescription for Naproxen and Hydrocodone was discontinued. He was prescribed Lodine and anti-fungal cream through November 4, 2013. He also was prescribed Ibuprofen as needed, Zantac, and Bactrim.

12.  On September 5, plaintiff was seen in medical. Upon examination, he was noted to have a large amount of bloody drainage on his old dressing. In addition, there was a copious amount of drainage at the abscess site on his right leg. The site was still red and swollen. The penrose drain was intact. Plaintiff complained of pain. The area was cleaned with warm soapy water and the dressing was changed. He was instructed to continue Bactrim. Also, he was given Lodine.

---

[13]  According to plaintiff, Nurse Leonard uttered cruel and tasteless things to him concerning his mother. Even if plaintiff had supported these allegation with competent summary judgment evidence, it would not impact the court's resolution of the pending motions.

16

13.    On September 6, plaintiff was seen in medical.  Upon examination, he had drainage and swelling at his right lower leg/ankle.  He was given Lodine.  It was recommended that he go to E. A. Conway Hospital as previously scheduled.

14.    On September 7, plaintiff was seen in medical.  He refused to have his dressing on his right leg changed because it had been changed late on the previous shift during Dr. Lee's visit.  Upon examination, his dressing was noted to be dry and intact.

15.    Later on September 7, plaintiff returned to medical.  Upon examination, there was a serosanguineous bleed-through on his dressing.  The dressing was changed, and the penrose drain was noted to be intact.

16.    On September 8, plaintiff was seen in medical.  Upon examination, there was a heavy serosanguineous bleed-through on his dressing.  There was no odor noted, however.  The penrose drain remained intact.  His dressing was changed, and he was to continue with antibiotic therapy.

17.    On September 9, plaintiff refused to have his dressing changed.  He stated that he would have it changed during the next shift, after he took his shower.

18.    On September 10, plaintiff was seen in medical.  Upon examination, there was a small amount of bloody drainage on his old dressing.  The area was washed and the drain was noted to be intact.  There was decreased swelling and redness.  Plaintiff reported that he was feeling better.  He walked with a steady gait.  He was still undergoing Bactrim therapy.

19.    On September 11, plaintiff was seen in medical.  He complained of increased pain. Upon examination, there was decreased redness and swelling, but increased warmth at the site on his right leg.  He explained that he felt better except at the site of his penrose drain.  His treatment was completed and an appointment was scheduled for him at E. A. Conway Surgical Clinic.

20.    Plaintiff was seen at E. A. Conway Medical Center on September 11,  regarding his right, lower leg abscess.  His "problem list" included athlete's foot, cellulitis, and laryngitis from reflux of stomach acid.  He was instructed to wash his wounds daily with soap and water, to re-dress his wounds with gauze daily until completely healed, and to call the E. A. Conway Surgical Clinic if redness, pain swelling or drainage occurred, or if the wound failed to heal after two weeks.

21.    Plaintiff returned to medical again on September 11.  Upon examination, there was drainage on his dressing; thus, it was changed.  He was directed to continue antibiotic therapy.

22.    On September 12, plaintiff was seen in medical.  Upon examination, there was moderate amount of drainage on his dressing.  His dressing was changed; he was to continue

antibiotic therapy.

23.     On September 13, plaintiff was seen in medical.  Upon examination, there was a
        moderate amount of drainage on his dressing, which was changed.

24.     On September 14, plaintiff returned to medical.  He complained of increased pain to his
        right leg.  Upon examination, there was no increased warmth to the site, but moderate
        discharge.  His dressing was changed and he was given anti-fungal cream.

25.     On September 15, plaintiff was seen in medical.  There was moderate drainage to his
        right leg.  He received treatment, as ordered.

26.     On September 16, plaintiff was seen in medical.  A moderate amount of drainage was
        noted.  He had no complaints of pain/discomfort to the area.  His dressing was changed to
        his right leg and he was to continue Bactrim.

27.     On September 18, plaintiff was seen in medical regarding the wound to his right leg.
        There was a small amount of drainage, but no redness.  He was to continue Bactrim.

28.     On September 19, plaintiff was seen in medical.  Upon examination, it was noted that
        there was some yellowish discharge.  His dressing was changed.

29.     On September 20, plaintiff returned to medical.  There was a moderate amount of
        drainage.  He voiced no complaints; his dressing was changed.

30.     On September 21, plaintiff was seen in medical.  There was a small amount of drainage.
        He voiced no complaints; his dressing was changed.

31.     On September 22, plaintiff was seen in medical.  Upon examination, there was yellow
        colored drainage, but no odor.  He voiced no complaints; his dressing was changed.

32.     On October 4, plaintiff was seen in medical.  Upon examination, there was a scant
        amount of yellow drainage noted, but no sign or symptoms of infection.  There was no
        odor.  He voiced no complaints; his dressing was changed.

33.     On October 7, plaintiff complained of right leg pain.  He also complained that the area
        where he underwent surgery for staph was red and swollen.  He requested to see a doctor
        as soon as possible.  He underwent a TB test on this date, which was negative.

34.     On October 8, plaintiff was seen in medical.  He complained of pain and swelling where
        he had undergone surgery for staph infection.  He also complained of an STD which had
        not been completely treated and continued heartburn.  Upon examination, the skin on his
        right lower leg was noted to be shiny and warm.  It appeared slightly swollen.  The

surgical site and spider bite site were scabbed over, with no drainage.  He had symptoms of an STD on his genitals.  A note was made about the plaintiff having a history of GERD, and something about Prilosec.  It was determined that he was suffering from an infection on his right leg.  He was scheduled to receive Prilosec and Bactrim through January 8, 2014.  He was scheduled to receive Cleocin for ten days.  His prescription for Zantac was discontinued.  He was given Cleocin and a topical ointment.

35.     On October 13, plaintiff was seen in medical for a recheck of the infection to his right lower leg.  He complained of sinus problems as well.  Upon examination, he had a swollen left septum.  His right lower extremity was much improved, with no redness or swelling.  He was scheduled to receive saline nasal spray and Claritin through January 13, 2014.

36.     On November 12, plaintiff was provided anti-fungal cream.

37.     On November 14, plaintiff filled out a medical request form.  He complained of a large knot behind his left ear, which was hurting.

38.     On November 15, plaintiff was informed that he could use Ketoconazole cream in lieu of anti-fungal cream.

39.     On November 19, plaintiff was administered anti-fungal cream, Prilosec, saline nasal spray, and Claritin.

40.     On December 13, plaintiff was transferred out of the TPDC to Lincoln Parish in stable condition.

Defs. Statement of Uncontested Material Facts; Affidavit of Helen Leonard; Defs. 2nd MSJ.

The foregoing chronology of plaintiff's medical records confirms that defendants were not deliberately indifferent to plaintiff's plight.  During plaintiff's convalescence from the staph infection to his right leg, he was seen on an almost daily basis by TPDC medical staff. Moreover, on several occasions, particularly when his leg infection worsened, TPDC transported him to E.A. Conway Hospital for evaluation and treatment.

The court notes that plaintiff also complains about the treatment he received (or failed to receive) for a fungal infection and an STD.  However, Dr. Lee and the nurse practitioner both examined plaintiff for these conditions.  While their initial diagnoses may have been incorrect,

19

there is no evidence that any such misdiagnosis was intentional or malicious.  Merely because the doctors and nurses may have incorrectly diagnosed and treated plaintiff's afflictions does not suffice to establish that they were deliberately indifferent to plaintiff's serious medical need. "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (citations omitted).  Furthermore, continuous medical care ordinarily precludes a finding of deliberate indifference on the part of prison officials.  *Banuelos v. McFarland*, 41 F.3d 232, 235 (5th Cir. 1995); *Mayweather v. Foti,* 958 F.2d. 91 (5th Cir. 1992).

In fact, plaintiff did not sue any of the TPDC's medical staff.  Moreover, in response to defendants' motion, he has not come forward with any competent summary judgment evidence to establish that defendants, Ricky Jones, John Smith, and Fred Schoonover were personally responsible for any misdiagnosis or delay in his treatment.  A defendant's "[p]ersonal involvement is an essential element of a civil rights cause of action." *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) (citation omitted).  Moreover, § 1983 does not support a cause of action for the wrongs of subordinates.  *Id*.[14]

In the end, the fact that plaintiff does not believe that his medical treatment was as swift

---

[14]  The court notes that plaintiff alleged in his complaint that on September 5, Warden Smith and Assistant Warden Schoonover seemingly threatened him with physical harm if he continued to complain -- notwithstanding his infected leg.  *See* Compl.  However, "mere threatening language and gestures of a custodial office[r] do not, even if true, amount to constitutional violations."  *Robertson v. Plano City of Texas*, 70 F.3d 21, 24 (5th Cir. 1995) (citations omitted).  Similarly, threats without a resulting constitutional deprivation do not support a § 1983 claim.  *Lamar v. Steele*, 698 F.2d 1286 (5th Cir. 1983).  Here, plaintiff continued to receive regular medical treatment at the TPDC, despite defendants' alleged threats.

or comprehensive as it could have been is not a cognizable complaint under the Civil Rights Act. Prisoners are not entitled to the "best medical care money can buy."  *See Mayweather, supra*; *Woodall v. Foti*, 648 F.2d 268 (5th Cir. 1981); *Barrett v. Mississippi Dept. of Corrections*, 2011 WL 2183431 (5th Cir. June 3, 2011) (unpubl.) (inmate's argument that medical staff did not use the most efficacious method of treatment, e.g., performing surgery earlier, does not establish a claim of deliberate indifference) (citation omitted).

## III.   Conditions of Confinement

a)   Law

Complaints about prison conditions – like medical care complaints – also are analyzed under the Eighth Amendment's proscription of cruel and unusual punishment.  The Eighth Amendment does not prohibit punishment; rather, it prohibits cruel and unusual punishment including the unnecessary and wanton infliction of pain.  *See Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392 (1981).  Additionally, while the Eighth Amendment does not mandate comfortable prisons, it does not permit inhumane ones.  *Harper v. Showers*, 174 F.3d 716, 719 (5th Cir.1999).  As discussed *supra*, federal courts employ a two-part test to determine whether a prisoner has established an Eighth Amendment violation.  *Harper,* 174 F.3d at 719.  First, there is an objective requirement that the plaintiff demonstrate conditions "so serious as to deprive prisoners of the minimal measure of life's necessities," as when the prisoner is denied "some basic human need."  *Woods v. Edwards*, 51 F.3d 577, 581 (5th Cir.1995); *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970 (1994).  Second, under a subjective standard, it must be shown that the responsible prison officials acted with deliberate indifference to the prisoner's conditions of confinement.  *Woods*, 51 F.3d at 581.  "The second requirement follows from the

21

principle that only the unnecessary and wanton infliction of pain implicates the Eighth

Amendment." *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970 (internal quotation marks and citations

omitted) (emphasis added).

"For conditions of confinement to rise to the level of an Eighth Amendment violation,

they must be "cruel and unusual" under contemporary standards. *Rhodes v. Chapman*, 452 U.S.

337, 347, 101 S.Ct. 2392 (1981).  To the extent that such conditions are restrictive and even

harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

*Id.*  However, when the restrictions of confinement rise to a level that results in physical torture –

the infliction of pain without penological purpose – such conditions may be considered as cruel

and unusual punishment under the Eighth Amendment. *Bradley v. Puckett*, 157 F.3d 1022, 1025

(5th Cir. 1998).

b)    <u>Discussion</u>

As recited previously, plaintiff alleges that while in lock down, he was exposed to mold

on the walls, insufficient ventilation, a spider infestation, "stuff" on the walls, rusty beds, a dearth

of cleaning supplies, and non-daily showers.  *See* Compl.  These conditions, while unpleasant,

simply do not rise to the level of Eighth Amendment violations. *Walton v. Topps*, Civ. Action

No. 12-0931, 2012 WL 3947629 (E.D. La. July 23, 2012) (citations omitted), *R&R adopted,*

2012 WL 3947976 (E.D. La. Sept. 10, 2012) (complaints of insects, dust, or mold do not amount

to constitutional violations).

Furthermore, to recover damages for exposure to dangerous conditions, a prisoner must

show that he suffered an actual physical injury.  *See* 42 U.S.C. § 1997e(e); compare *Alexander v.*

*Tippah County, Miss.*, 351 F.3d 626, 631 (5th Cir.2003).  With the notable exception of his

22

spider bite that subsequently became infected, plaintiff has not alleged that he sustained anything

other than *de minimis* harm or injury as a result to his exposure to the complained of conditions.

In short, the complained-of conditions cannot rationally be equated to "cruel and unusual

punishment," since the deprivations alleged were not so extreme as to ". . . rise to a level that

results in physical torture . . ." *Bradley v. Puckett*, 157 F.3d at 1025.

In any event, plaintiff has not established that the named defendants were deliberately

indifferent to these conditions of confinement.  By plaintiff's own admission, on September 27,

2013, the TPDC "thoroughly" cleaned and painted all of the cells.  (Petition).  In other words,

they took steps to redress the complained-of conditions.

## IV.    Government Entity and Supervisory Liability

To the extent that plaintiff intended to sue defendants in their official capacities,[15] the

court observes that official-capacity suits, "generally represent only another way of pleading an

action against an entity of which an officer is an agent."  *Kentucky v. Graham*, 473 U.S. 159,

166, 105 S.Ct. 3099, 3105 (1985) (citing, *Monell v. New York City Dept. of Social Services*, 436

U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035, n. 55 (1978)).  To impose § 1983 liability against a

government entity for the misconduct of one of its employees or officers, plaintiff must

---

[15]  In fact, defendants have appeared in this matter solely in their official capacities.  *See* Answer.  Nonetheless, defendants' motions for summary judgment are broad enough to encompass plaintiff's individual capacity claims.  Moreover, the court may grant summary judgment *sua sponte* so long as the adverse party receives adequate notice and a reasonable time to respond.  Fed.R.Civ.P. 56(f)(1); *Stingley v. Den Mar Inc.*, 2009 WL 2762374, *3 (5th Cir. Sept. 1, 2009) (unpubl.) (citing *inter alia, Love v. Nat'l Med. Enters.*, 230 F.3d 765, 770-71 (5th Cir.2000)).  The instant report and recommendation provides adequate notice to the parties.  *McCoy v. Wade*, 2007 WL 1098738, *1 (W.D. La. Mar. 12, 2007) (citing *Magouirk v. Phillips*, 144 F.3d 348, 359 (5th Cir.1998)).

demonstrate that the constitutional deprivation was caused by a policy or custom of the entity.

*Kohler v. Englade*,  470 F.3d 1104, 1115 (5th Cir. 2006) (citing *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 690-691, 98 S.Ct. 2018, 2036 (1978)).  "In a Section 1983 case, the burden of proving the existence of an unconstitutional municipal policy or established custom rests upon the plaintiff."  *McConney v. City of Houston*,  863 F.2d 1180, 1184 (5th Cir. 1989).

In the case *sub judice*, plaintiff has not established an underlying constitutional violation by defendants in their individual capacities.  *A fortiori*, he has not identified a precipitating unconstitutional custom or policy enacted by the government entity.  *See Bustos v. Martini Club Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) (because the officers did not violate plaintiff's constitutional rights, neither did the city).

Insofar as plaintiff seeks to hold defendants liable in their supervisory capacities, the court notes that supervisors can be held liable when the "enforcement of a policy or practice results in a deprivation of federally protected rights."  *Bustos, supra* (citation omitted).  Again, however, because plaintiff has failed to allege or establish a constitutional violation by the individual(s) directly involved in the challenged activity, he cannot show that any supervisor implemented a policy or custom that violated his constitutional rights.  *Bustos*, 599 F.3d at 468.

## Conclusion

For the above-stated reasons,

IT IS RECOMMENDED that the motion for summary judgment [doc. # 25] filed by plaintiff John Gregory be DENIED.

IT IS FURTHER RECOMMENDED that the motions for summary judgment [doc. #s 21 & 32] filed by defendants Ricky Jones, Fred Schoonover, and John Smith be GRANTED, and

that judgment be entered in favor of said defendants, dismissing with prejudice plaintiff's claims, in their entirety.  Fed. R. Civ. P. 56.

IT IS FURTHER RECOMMENDED that Helen Leonard be STRICKEN as a defendant from the docket sheet.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 2nd day of October 2014.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE